IN THE COUNTY COURT OF THE FIRST JUDICIAL

DISTRICT OF HINDS COUNTY, MISSISSIPPI

STATE OF MISSISSIPPI

VERSUS                                    CAUSE NO.:   19-801

TOMMY LEE SHERIFF                                        DEFENDANT

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN

THE PRELIMINARY HEARING OF THE ABOVE-STYLED AND

NUMBERED CAUSE BEFORE THE HONORABLE MELVIN V.

PRIESTER, SR., HINDS COUNTY COURT JUDGE, ON THE

5TH DAY OF AUGUST, 2019.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

APPEARANCES:

    Present and Representing the State:

        HONORABLE JAMIE MCBRIDE
        ASSISTANT DISTRICT ATTORNEY

    Present and Representing the Defendant:

        HONORABLE LYNN WATKINS
        ASSISTANT PUBLIC DEFENDER



EXHIBIT

C

State v. Tommy L. Sheriff    8-5-19

# TABLE OF CONTENTS

PAGE

Style and Appearances ---------------------- 1

Table of Contents -------------------------- 2

**Testimony of Detective Terrance Jackson**

    Direct Examination by Mr. McBride ------ 3

    Cross-Examination Mrs. Watkins --------- 7

    Redirect Examination by Mr. McBride ---- 15

Witness Excused ---------------------------- 17

**Testimony of Emma Taylor**

    Direct Examination by Mrs. Watkins ----- 17

Witness Excused ---------------------------- 19

Discussions -------------------------------- 19

Court's Ruling ----------------------------- 22

Preliminary Hearing Concluded ------------- 22

Court Reporter's Certificate ------------- 23

State v. Tommy L. Sheriff    8-5-19                    3

BY THE COURT:  *State v. Tommy Lee Sheriff.*

**DETECTIVE TERRANCE JACKSON,**

having first been duly sworn, was examined and testified as follows, to-wit:

**DIRECT EXAMINATION**

**BY MR. MCBRIDE:**

Q.    Detective, can you state your name for the record?

A.    Terrance Jackson.

Q.    Where are you employed, sir?

A.    City of Jackson Robbery/Homicide Division.

Q.    In that capacity did you come across Mr. Tommy Lee Sheriff?

A.    I did.

Q.    Do you see Mr. Sheriff in the courtroom?

A.    I do.

Q.    Can you point him out for the Court, please?

A.    Gentleman sitting here in the brown jumpsuit.

BY MR. MCBRIDE:  Your Honor, we'd ask that the record reflect that the

State v. Tommy L. Sheriff    8-5-19    4

witness identified the defendant.

BY THE COURT:  It will so reflect.

**BY MR. MCBRIDE:**  (Continuing)

Q.  Now, Mr. Sheriff is charged with house burglary and kidnapping; is that correct?

A.  Correct.

Q.  Based on my discussion with you, I understand that-- well, we'll get to that. Give us the circumstances about the house burglary and the kidnapping.

A.  On June 25th of this year officers responded to 3420 Shady Oaks Drive in reference to a black female that had been assaulted.  She was in her back yard putting out trash.  At this time a black male approached her, grabbed her and forced her across the back yard, up the stairs and used her as a battering ram into the house, forced his way into her home.

Q.  So he used her body to break into the home?

A.  Pretty much.

Q.  Okay.

A.  At this time the complainant was inside the house.  He hit the complainant several times, attempting to pull the

complainant's clothes off.  As she fought with him, she was able to grab a vase from the shelf, struck the defendant and was able to run out through the front door.

Q.    How long did it take for you to identify a suspect?

A.    Took us approximately-- he was identified on July 8th.

Q.    So it was several days later?

A.    Well, maybe a week or so later.  It happened on the 25th and he was identified on July 8th.

Q.    How did he come to your attention?

A.    On July 2nd another incident occurred that fit the same description where-- it occurred over on Queensroad on July 2nd.  That victim identified a black male wearing a black shirt, red pants, but she couldn't give a positive identification as far as his face and what he looked like.

Q.    Did she say he was trying to sexually assault her?

A.    He did.  He forced his way into the house.  She was sitting outside and she went-- she was on the corner of her house putting out

the trash.  He then came around the back, the rear of the house, grabbed the individual, forced her into the home...on top of her-- he had gloves.  He was covering her face-- and pulled her clothes off.  And at that time he attempted to assault her and rape her.

She was able to reach up under her pillow and pull out a gun.  The gun went off.  At this time the subject grabbed the gun and told her, "Don't turn over," and he was going to the bathroom.  At that time she heard her front door closed and realized that the subject had left.

Q.    Based on your information from that case, what occurred next?  How did the first victim identify him?

A.    Well, based on that information, one of the neighbors identified Mr. Sheriff as being on her street the day of the 2nd, on July 2nd.  But to me, there wasn't enough for me to identify or charge him with the Queensroad incident.

So, at that time I did take a lineup back to the individual over on Shady Oaks, showed her the six-man, non-suggestive lineup.  At

State v. Tommy L. Sheriff    8-5-19

that time she identified Mr. Sheriff as the individual that grabbed her in the back yard, forced her up the stairs and used her to ram himself inside her house.

Q.    And the man who tried to take her clothes off?

A.    Yes.

Q.    Did she have any doubt that it was him?

A.    No.  She had no doubt at all.

Q.    Did it take her very long to identify him?

A.    Not at all.

Q.    Because she knew it was him?

A.    Yes.

Q.    And the first instant, the one we've got him charged with here today, did that occur in Jackson, Mississippi?

A.    Yes, it did.

BY MR. MCBRIDE:  Tender the witness, Your Honor.

**CROSS-EXAMINATION**

**BY MRS. WATKINS:**

Q.    Detective, I assume that you showed the picture to the Queensroad person who was

assaulted?

A.   Yes, ma'am, we did.  She could not identify him.  She could only give a clothing description.

Q.   Did he grab her from the back, as well?

A.   Yes, he did.

Q.   What time of day or night was this?

A.   That incident occurred, Queensroad-- one second.  It was in the evening time.  It was approximately, I think, around 4:00ish or 5.  I'm not sure, but it was still sunlight when we got there.

Q.   So you went on scene?

A.   Yes, I did.  I responded to both scenes.

Q.   Did you also present the photo lineup to the Queensroad individual who is the subject there?

A.   Well, that incident occurred at 19:25.

Q.   Okay.  So 7:25.  So it's coming on dark?

A.   Yes.  At that time we did not produce a lineup to her, because at the time we didn't have a suspect.  She could only give a clothing

description and what he smelled like.

Q.    What was that?

A.    Well, she just said he had a horrible smell.  She gave a clothing description of a black shirt and red pants.  Witnesses throughout the neighborhood did describe Mr. Sheriff as an individual that she saw earlier with a black shirt and red shorts on but she just identified him as being on her street.

Q.    These were neighbors?

A.    Yes.  This was one of the neighbors. All she could say was she saw him on the street.

Q.    About what time of day?

A.    She said it was prior to us getting there.  So, it was earlier.  She didn't have an exact time.  She just described that, yes, she did see him walking on her street and she remembered what he had on.

Q.    She knew Mr. Sheriff, is that correct?

A.    Yes.

Q.    This was a neighbor.  How far from the Queensroad individual did she live?  Did she live two houses down or three houses down?

A.    I would say approximately, maybe, four

houses but it was across the street.

Q.    Four houses down, across the street?

A.    Yes.

Q.    Now, is that a heavily traveled road, or is it pretty much a neighborhood street?

A.    Well, it's a neighborhood street.

Q.    This individual who said that she saw Mr. Sheriff walking down the street knew Mr. Sheriff from the neighborhood; is that correct?

A.    Correct.

Q.    And the Queensroad individual could only make a clothing description and odor description but could not tell you who it was and could not identify Mr. Sheriff; is that correct?

A.    Correct.

Q.    Now, the lady on Shady Oaks, did she know Mr. Sheriff from the neighborhood?

A.    I don't know if prior to it, but she did identify him.  She didn't state that she knew him from the neighborhood but she had seen him around.

Q.    Did she know his name?

A.    No, she did not.

Q.    Now, wasn't there also a third

incident that was similar in nature around this time?  Bel Air?

A.    Yes, it was.  That incident I want to say-- I'm not sure where it actually occurred. I'm thinking it occurred on California but I'm not exactly sure.

Q.    Yes, sir.

A.    But what happened was an individual was attempting to go into a home and was scared off by the homeowners.

Q.    Do you remember the date this occurred?

A.    No, I don't.

Q.    Do you remember their description of the individual?

A.    No, I don't.

Q.    How far away is that from where these incidences occurred?

A.    It's hard to say, because it's the Bel Air neighborhood.

Q.    Right.

A.    And the way the streets traveled and curve, it gives a different pattern over there. So, some streets are straight.  Some streets are curved.  Some of them are pretty much, I

say, U-turns, and I think one or two are cul-de-sacs.

Q.    Again, just to reiterate for the record; for the Shady Oaks lady, she never saw him?  Or she saw his face at what point?

A.    She said when she was putting the garbage out and turned around he was standing there.

Q.    Mr. Sheriff was standing there?

A.    Yes.  And that's when he grabbed her and forced her up the stairs-- because she had stairs in the back of her house.  Forced her up the stairs and pushing her through the door. She saw him while he was standing there.

Q.    Detective, let me ask you this.  Was there any physical evidence recovered from the scene?

A.    Which one?

Q.    Either one.  I mean, you're only charging him with the Shady Oaks, is that right?

A.    Yes, but--

Q.    He has not been charged in the other?

A.    No.  He has not been charged with the Queensroad, but evidence from the Queensroad

has been sent off to the crime lab to see if there is any DNA comparison that will tie him to the scene.

Q.    So you recovered evidence that would yield DNA evidence at the Shady Oaks scene?

A.    Yes.

Q.    And that has been sent to the crime lab?

A.    Yes, ma'am.

Q.    Anything else other than DNA type evidence?

A.    No.

BY MRS. WATKINS:  Court's indulgence just one moment.

(PAUSE IN PROCEEDINGS)

**BY MRS. WATKINS:**  (Continuing)

Q.    Was there any search conducted of Mr. Sheriff's home or where he stayed?

A.    Mr. Sheriff, we were told, lived at large, that he didn't have a home.  He was arrested standing on the next street.  I can't think of the name of the street, but he was standing out under a tree.  So...

Q.    What was he wearing?  Just out of curiosity.

State v. Tommy L. Sheriff    8-5-19                    14

A.    I think that day he was wearing all black.  I'm not sure.  But that resident that was given as Mr. Sheriff's, the officers went there several times.  No one ever came to the door.

Q.    Did you ever talk, detective, to other individuals in the neighborhood who voiced support for Mr. Sheriff and said that they didn't think he could be capable of committing such a crime?

A.    Yeah.  A couple of individuals did say that they didn't think that he was capable of doing anything like that, but that didn't impede the investigation, because at that point we had an eye witness who vividly identified him.  And that's why he wasn't charged with the Shady Oaks, even though the description of his clothes were given.  A person saw him on the street, identified him.  And also, I think someone even sent a picture out on Facebook with him wearing the black shirt and red shorts.

Q.    Do you have that in evidence?

A.    No.  I don't have it here.

Q.    Okay.  So that's from Facebook?

A.    Yeah.   This is what was sent out on Facebook.

Q.    Okay.   Those are shorts.

A.    But this is dealing with the Queensroad incident.   Even with that being said, Mr. Sheriff was not arrested on that.

Q.    Now, did you also say that one of the ladies said that she struck her assailant with a vase or a--

A.    Well, she said she was able to hit him with a vase to get away.   She didn't say where.

Q.    Were any marks similar to that found on Mr. Sheriff?

A.    I can't say, because we didn't really examine Mr. Sheriff that morning.   He refused.

Q.    Did he give a statement?

A.    He started off with a statement and then he cancelled it.   He ended the interview.

                BY MRS. WATKINS:  Nothing further
            at this time, Your Honor.

                BY THE COURT:  Any redirect?

                BY MR. MCBRIDE:  Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. MCBRIDE:**

Q.    The Shady Oaks is the event we're

Case 3:22-cv-00392-TSL-RPM    Document 5-3    Filed 09/26/22    Page 16 of 23

State v. Tommy L. Sheriff    8-5-19                    16

talking about, right?  The charges are for the
Shady Oaks events?

A.    Yes, it is, sir.

Q.    And the victim in that case, she told
you that he seized and confined her against her
will, did he not?

A.    Yes, he did.

Q.    And he forced her into her house?

A.    Yes, he did.

Q.    Did the door break open, or was it
just pushed open?

A.    Well, it was forced open.  It wasn't
just it was broken open but it was forced open.

Q.    And she told you that when he forced
her in and kept her in that house, he attempted
to remove her clothes?

A.    He did.

Q.    And then she was able to get away from
him?

A.    She was.

Q.    By hitting him with a vase?

A.    Yes.

Q.    And then she identified him in the
lineup?

A.    Yes, she did.

BY MR. MCBRIDE:  That's all I have, Your Honor.

BY THE COURT:  Thank you, detective.

(Witness Excused)

BY MRS. WATKINS:  I have a witness.  Mrs. Emma Taylor and possibly Ms. O.C. Holcomb.

**EMMA TAYLOR,**

having first been duly sworn, was examined and testified as follows, to-wit:

**DIRECT EXAMINATION**

**BY MRS. WATKINS:**

Q.   Mrs. Emma, would you please state your name for the court reporter and the Court?

A.   Emma Sheriff Taylor.

Q.   Is that just as it sounds, Emma?

A.   E-M-M-A.

Q.   Now, do you know Mr. Sheriff?

A.   He's my nephew/brother.

Q.   So you've known him his entire life, is that correct?

A.   His entire life.

Q.   And he's some 51 years old?

A.   Yes.

State v. Tommy L. Sheriff    8-5-19                                18

Q.    But y'all are close in age?

A.    Somewhat.  I'm 70.

Q.    Thank you.  So you are aware of the allegations made against Mr. Sheriff, Ms. Taylor?

A.    Yes, I've been told.

Q.    Can you tell me what his reputation in the Shady Oaks community has been?

A.    What he is accused of is not Tommy.

BY MR. MCBRIDE:  Your Honor, I'm going to object to this.  I think this is completely irrelevant.  I mean, she apparently wasn't there and just going to tell about a reputation that she's heard in the neighborhood.  I don't see how that's relevant to this hearing.

BY THE COURT:  Sustained.

**BY MRS. WATKINS:**  (Continuing)

Q.    Do you live on Shady Oaks Street, Mrs. Emma?

A.    No.  I grew up on Shady Oaks Street but I don't live there.

BY MRS. WATKINS:  Your Honor, may I ask about his reputation for

violence or peacefulness at this stage of the proceedings?

BY THE COURT:  I really don't think so.

BY MRS. WATKINS:  Thank you.  I would like to ask, if I may, about a Facebook page in support of Mr. Sheriff by neighborhood individuals, if she can tell me anything about that.

**BY MRS. WATKINS:**  (Continuing)

Q.  Are you aware of any social media support?

A.  No.

Q.  All right.

BY MRS. WATKINS:  Nothing further at this time of Mrs. Emma.

BY THE COURT:  Cross?

BY MR. MCBRIDE:  No, Your Honor.

BY THE COURT:  Thank you, ma'am. You can step down.

(Witness Excused)

BY THE COURT:  Do you have another witness?

BY MRS. WATKINS:  Well, Your

State v. Tommy L. Sheriff    8-5-19

Honor, I guess I'd like the Court to see that individuals from the neighborhood who have known him most of his life just to show their standing support, to see community support for Mr. Sheriff. He's 51 years old. You know, we all get a record after a while.

BY THE COURT: Do you have any response to that?

BY MR. MCBRIDE: Yes, Your Honor. I would object. Usually the people that are showing support sit back there (Indicating), if they have relevant testimony.

I mean, you know, but my guess is there could be another witness like the last one who wasn't there and doesn't know what happened. The only information they would have was what somebody told them on the street. So, I don't see how that's relevant for this hearing.

BY MRS. WATKINS: It might be relevant for the consideration of

bond.

BY THE COURT:  I'm looking at his jail history and it's heavy.  And I'll just say this straight out.  To me, this is more relevant than any of the people that he grew up with or lived in the neighborhood with.  As I go down just the first page, I'm counting nine felonies dating back to 1988.

BY MRS. WATKINS:  Your Honor, I don't remember his conviction history. It's been a while since I've checked.

BY THE COURT:  I understand that.

BY MRS. WATKINS:  Are they arrests or convictions?

BY THE COURT:  They are definitely arrests.

BY MRS. WATKINS:  Yes, sir.

BY THE COURT:  I don't find that such testimony would be of any use.

BY MRS. WATKINS:  Yes, sir.

BY THE COURT:  Therefore, I'm not going to allow it.

BY MRS. WATKINS:  I had to try.

BY MR. MCBRIDE:  Thank you, Your

Honor.

BY MRS. WATKINS:  He does have a million dollar bond, Your Honor.  And if I may be allowed to address that issue, if the Court wishes to hear it.

BY THE COURT:  First, let me go on the record and say that the Court finds sufficient probable cause to send it on to the grand jury.  As to the million dollar bond, that bond will remain the same.

BY MR. MCBRIDE:  Thank you, Your Honor.

*   *   * PRELIMINARY HEARING CONCLUDED *   *   *

COURT REPORTER'S CERTIFICATE

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, Sara G. Sims, Official Court Reporter for the Hinds County Court, do hereby certify that the foregoing 22 pages, and including this page, constitute a true and correct transcript of the proceedings had upon the Preliminary Hearing in the aforesaid-styled and numbered cause before the Honorable  Melvin V. Priester, Sr., Hinds County Court Judge, on August 5, 2019.

I do further certify that my certificate annexed hereto applies only to the original and certified transcript.  The undersigned assumes no responsibility for the accuracy of any reproduced copies not made under my control or direction.

Witness my signature, this the 19th day of October, 2020.

SARA G. SIMS
Official Court Reporter
CSR 1118
