IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) Case No.: 3:16-cv-00489-CWR-JCG |
| | ) |
| | ) |
| HINDS COUNTY, ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |
| | ) |

## UNITED STATES' MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT

Plaintiff United States files this Motion for an Order to Show Cause Why Defendants

Hinds County, Members of the Hinds County Board of Supervisors, and the Sheriff of Hinds

County Should Not Be Held in Contempt of the Court's July 19, 2016 Order and Settlement

Agreement. Order, July 19, 2016, Doc. No. 8 (hereinafter "Order, Doc. No. 8"); Settlement

Agreement Between U.S. and Hinds County, Miss., Regarding the Hinds County Jail, July 19,

2016, Doc. No. 8-1 (hereinafter "Settlement").

The Settlement mandated improvements designed to remedy alleged systemic

constitutional violations in the Hinds County Jail ("Jail"), which includes three facilities (the

Raymond Detention Center ("Raymond"), the Jackson Detention Center, and the Work Center).

These alleged violations include Defendants' failure to protect prisoners from harm, regulate use

of force, and ensure safe conditions of confinement. The Settlement's Effective Date was July



19, 2016.

Defendants should have implemented most Settlement provisions within one year of the Effective Date, or by July 19, 2017. Based on the Monitor's last written report, filed on March 5, 2019, and her May 9, 2019 oral report to the Court, Defendants have sustained substantial compliance with only one provision, the requirement for a full-time compliance coordinator, and achieved substantial compliance with only one additional provision, which required separate youth housing from adults. Court-Appointed Monitor's Seventh Monitoring Report at 9-10, 73, 102, Doc. No. 27 (hereinafter "Monitor's Seventh Report"). Defendants have missed every major Settlement deadline. As a result of Defendants' ongoing noncompliance and failure to make adequate progress in implementing critical Settlement provisions, Jail conditions remain violent and dangerous.

In support of this Motion, the United States contemporaneously files a Memorandum of Law in Support, and the following documents:

  Attachment 1  Enforcement Letter (1/10/19)

  Attachment 2  Supplemental Enforcement Letter (1/24/19)

  Attachment 3  May 2019 Transcript (5/9/19 pp 15-20)

  Attachment 4  Incident Information (12/6/18)

  Attachment 5  October 2017 Transcript (10/25/17 pp 55-56)

  Attachment 6  Sheriff's Letter 3/4/19

  Attachment 7  Board Letter 3/4/19

  Attachment 8  Priority Recommendations June 2018

The United States further states the following:

1.      The parties entered into the Settlement after the United States issued a May 21, 2015 notice pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, describing numerous violent incidents, excessive use of force, and even riots.

2.      Prisoner-on-prisoner assaults, escapes, staff uses of force, and mass disturbances continue to beleaguer the Jail.  In response, Defendants have allowed increased amounts and types of use of force, without adequate policies, training, safeguards, and supervisory oversight, to prevent misconduct.  Monitor's Seventh Report at 3-4, 35-48.

3.      In her last written report, the Monitor warned that Defendants risk a major riot if they do not implement Settlement requirements.  Monitor's Seventh Report at 34.  At the May 9, 2019 status conference, the Monitor informed the Court that another riot had indeed occurred.

4.      Pursuant to Settlement Paragraph 163, the United States formally notified Defendants that they had violated key Settlement provisions, and that their violations exposed prisoners to dangerous, unconstitutional conditions.  The United States supplemented the Enforcement Letter after the Monitor completed a January 14-18, 2019 compliance inspection.

5.      On March 4, 2019, Defendants responded.  Generally, Defendants acknowledged some areas of non-compliance, reported recent, unconfirmed improvements, promised additional improvements, and offered explanations for non-compliance.  Notably, the Sheriff's Letter does not claim compliance with the Settlement and actually acknowledges some of the United States' concerns about dire conditions in the Jail.  The Board's Letter also generally does not claim that Defendants have complied with the Settlement.  Instead, the Board:  a) asserts that responsibility for responding to the United States' concerns lies primarily with the Sheriff; b) claims that the

County complied with the Settlement's youth provisions by moving youth from the Jail to the Henley-Young facility; and c) repeats arguments previously made to the Court at a January 15, 2019 status conference. As further discussed in this Motion and accompanying Memorandum of Law, neither response obviates the need for contempt.

6. Because the parties have not been able to resolve their differences, the United States now moves for contempt as permitted by the Settlement. While Defendants are in breach of the Settlement generally, the United States asks the Court for relief only in regards to certain key provisions that are the foundation for further reforms and that were identified in the United States' Enforcement Letters.

### Defendants Have Unreasonably Delayed the Development of Policies and Procedures Needed to Ensure a Safer Facility.

7. Defendants have not drafted or implemented adequate policies and procedures that comport with Settlement requirements. The Settlement requires Defendants to review and develop appropriate policies and procedures "within 6 months of the Effective Date." Defendants missed this deadline and have failed to take the steps required to come into compliance.

### Defendants Allow Security Staff to Use Force Without Adequate Supervisory Oversight, Training and Controls.

8. Defendants have not remedied longstanding problems with use of force in the Jail. The Settlement requires that use of force policies include minimum training requirements, inventory controls, supervisory oversight, medical checks, documentation, and use of force investigations. Defendants have not completed use of force policies that fit the needs of a corrections facility. Monitor's Seventh Report at 35-45.

9.      Without adequate policies, training, and oversight, staff continue to use hazardous techniques - including hard physical strikes, tasers, and recently, "less lethal" shotguns - without adequate safeguards. Monitor's Seventh Report at 35-45. Jail staff, including supervisors, have misused force, and failed to provide accurate reports about such use. *Id.* at 3-4, 35, 41.

**Defendants Have Taken No Action to Develop and Implement Staffing and Supervision Requirements.**

10.     Defendants have not implemented an adequate Jail staffing and supervision plan. The Settlement requires Defendants to hire sufficient staff "to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail." It also requires implementation of a staffing study. The study adopted in this case recommends approximately 433 Jail positions. Court Appointed Monitor's Third Monitoring Report at 14-17, Doc. No. 19 (hereinafter "Monitor's Third Report"). Defendants have not even begun to budget or plan for a staffing increase intended to satisfy the staffing study. According to the Monitor's last written report, only 238 budgeted positions were filled. Monitor's Seventh Report at 2, 13-16. During the May 9, 2019 status conference, the Monitor reported that the most recent staffing data showed that the current staffing level was even lower than last reported.

11.     Defendants' failure to plan, authorize, or budget for adequate numbers of security staff is longstanding. Inadequate recruitment, pay, and retention programs have led to constant staffing problems, and the most recently assessed staffing level of 238 Jail positions is comparable to staffing levels over past years. *See* Monitor's Seventh Report at 13-16; Monitor's Sixth Report at 17; Monitor's Third Report at 16; Court Appointed Monitor's First Monitoring Report at 12, Doc. No. 12-1 (hereinafter "Monitor's First Report").

12.     Without adequate staffing, Defendants cannot implement critical prisoner supervision and security policies, including objective classification, welfare checks, safety inspection rounds, and direct supervision of prisoners. Monitor's Seventh Report at 10-18.

13.     Grossly inadequate staffing means that there are no officers assigned to critical posts, conducting welfare checks, or responding to serious incidents. Monitor's Seventh Report at 2-4, 15-16, 26-28; Monitor's Sixth Report at 17 ("The current staffing is inadequate to safely operate the Jail."). For instance, there are no officers assigned to general population units in order to conduct "direct supervision" of these units.[1] Monitor's Seventh Report at 15-16. Defendants also recently ceased 24-hour staffing of the critical suicide and special management units. Monitor's Seventh Report at 15; Monitor's Sixth Report at 17.

**Defendants Have Failed to Follow the Settlement Requirements when Making Supervisor and Training Staff Hiring Decisions.**

14.     Defendants have not hired and retained qualified trainers and supervisors. Instead, Defendants have promoted or hired trainers and supervisors without adequate credentials, including individuals with significant disciplinary histories and little or no jail background. *See* Monitor's Seventh Report at 12-13; Monitor's Sixth Report at 13-15.

**Defendants Have Failed to Correct Serious Physical Plant and Safety Equipment Deficiencies.**

15.     The Jail's physical plant remains unreasonably dangerous. Defendants have not developed basic inspection and maintenance procedures needed to improve physical plant and fire safety. Broken locks, inadequate video camera coverage, inoperative doors, inoperative fire safety equipment, and unsecured critical posts are particularly serious problems in the Raymond facility. The physical security of that facility is so poor that staff have grown accustomed to

---

[1] The Settlement defines "direct supervision" more completely at Paragraph 9. It is a term of art that involves placing officers in housing units so they have continuous interaction with prisoners.

ignoring gaping security gaps. Monitor's Seventh Report at 3, 32-34; Monitor's Sixth Report at 2, 4, 32-34. Developing a maintenance program, better supervision, and improved safety inspection processes could mitigate some of the pre-existing physical plant problems and prevent prisoner vandalism, but Defendants have failed to adopt such required reforms. Monitor's Seventh Report at 3, 32-34; Monitor's Sixth Report at 2, 4, 32-34.

**Defendants Have Not Completed the Transition of Youth Prisoners from the Jail to a Facility with the Required Age-Appropriate Programs.**

16.     Defendants continue housing youth in facilities that do not provide required programs. The Settlement gave Defendants the option to decide where to house youth as long as any facility met minimum supervision, education, housing, and programming standards. Defendants should have made that decision within six months of the Effective Date and implemented that decision 12 months later. As specifically permitted by the Settlement, Defendants decided to transition all youth to the Henley-Young Juvenile Detention Center. However, until recently, Defendants continued to house youth at the Jail's adult Raymond facility. After the United States issued its Enforcement Letters, Defendants finally moved the last youth from Raymond to Henley-Young in February 2019. However, Defendants do not have any policy prohibiting the return of youth to Raymond. Moreover, their responses to the Enforcement Letters do not provide a clear commitment to keeping the youth out of the Jail. Monitor's Seventh Report at 5, 64-68.

17.     More importantly, Defendants have not completed policy changes, program improvements, and facility modifications in order to house youth at Henley-Young in a manner consistent with Settlement requirements. Monitor's Seventh Report at 5-6, 64-80. Defendants have no clear plan to complete implementation of the relevant Settlement provisions. Behavior management, mental health, and education programs are still rudimentary. While improving these programs is a longer-term, complex project, Defendants have failed to make even relatively

7

limited improvements, such as converting a part-time psychologist position to full-time or devising a plan to add programming (classroom) space.  Monitor's Seventh Report at 5-6, 67-69.

**Defendants' Non-Compliance Is Longstanding, Current, and Ongoing.**

18.     The Settlement has a court-ordered "Effective Date" of July 19, 2016.  Defendants have repeatedly missed deadlines for implementing Settlement provisions addressed by this Motion. *See generally* Court-Appointed Monitor's First, Second, Third, Fourth, Fifth, Sixth, and Seventh Monitoring Reports, Doc. Nos. 12-1, 16, 19, 22, 23, 24, 27.

19.     The Court ordered Defendants to begin implementing the Settlement provisions "immediately upon the Effective Date."  Unless otherwise specified, all Settlement requirements "must be implemented within one year of the Effective Date," or July 19, 2017.  *Id.*

20.     More than a year after full compliance with the Settlement was due, Defendants are only in substantial compliance with two provisions.  Monitor's Seventh Report at 9-10.[2]  Throughout this time, prisoners confined in the Jail continue to suffer serious harm and ongoing risk of serious harm.  This Motion targets the Settlement provisions that are foundational to Defendants' ability to expedite progress and address the ongoing harm.

WHEREFORE the United States respectfully requests that the Court Order Defendants to Show Cause Why They Should Not Be Held in Contempt of Settlement Agreement Paragraphs 9, 22, 37-39, 41-42, 44-46, 50-62, 68, 78-84, 130-31, and for any additional relief that the Court deems necessary.

Respectfully submitted,

---

[2] Defendants are in partial compliance with 44 provisions and non-compliant with 46 provisions.

**FOR THE UNITED STATES:**

D. MICHAEL HURST, JR.
United States Attorney
Southern District of Mississippi

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN ROSENBAUM
Chief
Civil Rights Division
Special Litigation Section

/s/ Candace G. Mayberry
CANDACE G. MAYBERRY (MS #104014)
MITZI DEASE PAIGE (MS #6014)
Assistant U.S. Attorneys
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Ste. 4.430
Jackson, MS 39201
candace.mayberry@usdoj.gov
(601) 973-2838
(601) 965-4409 (fax)

/s/ Laura L. Cowall
LAURA L. COWALL (DC # 481379)
Special Counsel
laura.cowall@usdoj.gov
(202) 514-1089
(202) 514-0212 (fax)

/s/ Christopher N. Cheng
CHRISTOPHER N. CHENG (PA #69066)
Trial Attorney
christopher.cheng@usdoj.gov
(202) 514-8892
(202) 514-4883 (fax)

AARON FLEISHER
Trial Attorney
aaron.fleisher@usdoj.gov

United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record:

/s/ Candace G. Mayberry
CANDACE G. MAYBERRY (MS #104014)
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Ste. 4.430
Jackson, MS 39201
candace.mayberry@usdoj.gov
 (601) 973-2838
(601) 965-4409 (fax)



No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.

*Defendants.*

ORDER TO SHOW CAUSE

Before CARLTON W. REEVES, *District Judge.*

In 2016, the United States Department of Justice brought this action to end unconstitutional conditions of confinement at Hinds County's Raymond Detention Center (RDC). The parties entered into a Consent Decree to correct the problems.

It is now 2021. Much has changed in the world, the United States, the State of Mississippi, and even in Hinds County. Not so for RDC. The unconstitutional conditions have not been remediated—they have no end in sight, in fact. And the County's failure to remedy the conditions has caused

"needless suffering and death," *Brown v. Plata*, 563 U.S. 493, 501 (2011), including six deaths so far this year.

Proceedings are therefore necessary to determine whether Hinds County should be held in civil contempt and RDC placed into federal receivership.

## I.  Factual and Procedural History

### A.  The Political Landscape

The Raymond Detention Center opened in 1994, when Malcolm McMillin was the Sheriff of Hinds County. He had been elected in 1991, replacing J.D. McAdory, who had served as Sheriff since 1972. Leah Rupp, *In the Limelight Again*, Clarion-Ledger (Nov. 18, 2007). McMillin, like McAdory, would remain in office for 20 years. *Id.*

The 2011 election saw the beginning of a series of one-term Sheriffs. That year, Tyrone Lewis unseated McMillin. *Former Hinds County Sheriff Malcolm McMillin dies*, WJTV (Dec. 22, 2016).[1] Four years later, the voters replaced Lewis with Victor Mason. Jimmie E. Gates, *Hinds to settle feds' OT case*, Clarion-Ledger (Dec. 28, 2016). In 2019 the voters rejected Mason after only one term, this time in favor of Lee Vance. Jimmie E. Gates, *Lee Vance defeats incumbent Hinds Sheriff Victor Mason in Democratic runoff*, Clarion-Ledger (Aug. 27, 2019). Sadly, Vance died on August 3, 2021. Therese Apel, *Sheriff Lee Vance Passes Away After A Medical Emergency At Home*, Darkhorse Press (Aug. 4, 2021).

---

[1] As Sheriff McMillian explained in testimony before the Department of Justice, Office of Justice Programs, the voters "turned him out to pasture." Review Panel on Prison Rape, Hearings on Rape and Sexual Misconduct in U.S. Jails 447 (Sept. 16, 2011) [hereinafter *OJP Testimony*].

The Hinds County Board of Supervisors appointed an Interim Sheriff until a special election could be held to fill the remainder of Vance's term. On August 16, 2021, the Board appointed Marshand Crisler to be that Interim Sheriff. *Marshand Crisler named interim Hinds County Sheriff,* Jackson Advocate (Aug. 16, 2021).

The special election was held on November 2. Thirteen candidates offered themselves to the voters. Brendan Hall, *Meet the Hinds County Sheriff candidates before casting your vote on Nov. 2,* WLBT (Oct. 30, 2021). When no candidate drew a majority of voters' support, a runoff was necessary between the top two candidates: Crisler and Tyree Jones, who was part of Vance's command staff.

The runoff election was held earlier today, November 23. At the time of the release of this Order, the winner has not been certified.

Like the Sheriff's Office, in the 27 years that RDC has existed, there has been considerable turnover in the Board of Supervisors. None of the current members of the Board were Supervisors when RDC opened. Only two current board members, Robert Graham and Bobby "Bobcat" McGowan, were Supervisors in 2014, when the U.S. Department of Justice notified Hinds County that it was "commencing an investigation into conditions of confinement at the Hinds County Detention Center." Docket No. 3-1. Graham and McGowan were also the only two sitting Supervisors in office when this action was filed on June 23, 2016.

### B.    The Conditions of Confinement

"There is a long tradition of professional excoriation of jail conditions." Margo Schlanger, *Inmate Litigation,* 116 Harv. L.

Rev. 1555, 1686 n.434 (2003). Experts have called jails "the worst blight in American corrections." *Id.* (citation omitted). They are "more dangerous" and "more chaotic" than prisons, with less regular routines, more idle time, and detainees who are more likely to be experiencing a crisis. *Id.* at 1686–87.

The Supreme Court summed up jails as "generally deplorable" institutions that can have a "destructive effect on human character." *Barker v. Wingo*, 407 U.S. 514, 520 (1972). "The time spent in jail is simply dead time." *Id.* at 532-33.

RDC in particular has been troubled since it opened. As one writer explained, since its inception, "the jail designed to improve conditions for detainees has faced a myriad of problems: structural deficiencies, chronic understaffing and poor management. But fixing those problems have been elusive under whatever sheriff and Hinds County Board of Supervisors are in elected office at a given time." Kayode Crown, *One Jail's Tale: Hinds County Detention Center At Risk Of Federal Takeover*, Miss. Free Press (Oct. 15, 2021).

Captain Diane Riley testified shortly after RDC's opening that "the new jail's doors were inadequate to provide security." *Dean v. Thomas*, 933 F. Supp. 600, 608 (S.D. Miss. 1996). That is, the cell doors failed to lock. Twenty-seven years later, the cell doors still fail to lock. *See* Docket No. 94 at 4 [hereinafter *Fourteenth Monitoring Report*]; *see also* Ruth Ingram, *Year after riot, cell doors at Hinds County jail still don't lock*, Clarion-Ledger (July 23, 2013); Ruth Ingram, *Officials: 'Antsy' juvenile inmates flood area at Hinds jail in Raymond*, Clarion-Ledger (July 19, 2013) ("We have doors with no locks," the Sheriff's spokesman candidly admitted.); Docket No. 31 at 20 ("the Jail continues to lack even the most basic security and safety features, such as lockable cell doors . . . ."); Docket No. 60 at 4 ("At RDC,

4

doors and locks are broken. Prisoners can break out of their cells, break out of their housing units and even enter a jail control room.").[2]

A significant riot in 2012 brought the facility's problems to the forefront. "[P]risoners destroyed fixtures and walls, sprayed water hoses and fire extinguishers, and left ceilings in shambles," the State's newspaper of record reported. Ruth Ingram, *Jail getting repairs; much more needed,* Clarion-Ledger (Nov. 7, 2012). "It's no secret that the door locks need to be replaced," Chief Deputy Chris Picou added. "I don't know that the jail has ever been up to industry standards." *Id.*

A series of escapes in 2012 and 2013 shed additional light upon the conditions at the jail. *See* Ruth Ingram, *Escape draws attention to jail, policies,* Clarion-Ledger (Apr. 22, 2013) ("Escapes this year and last have been blamed on faulty locks and security for jail and cell doors. The county last year ordered emergency repairs in April on doors that had been problematic and a security risk since the facility opened in 1994."). Sheriff Lewis, who had commissioned a 500-page report on the previous administration, blamed the escapes on

---

[2] The faulty locks have cost the County dearly. In one case, it was reported that Hinds County "agreed to pay . . . inmate Michael Burnley[] $3 million after another inmate jimmied open a cell door and attacked Burnley, leaving him paralyzed. . . . The county has spent at least $13 million on repairs since." Heather Civil, *Jail Conditions,* Clarion-Ledger (Aug. 15, 2008). In the lawsuit, Sheriff McMillin admitted that the locks were faulty and had been an ongoing problem. A member of the Board of Supervisors, meanwhile, explained that the settlement "was about the best deal" the County was likely to get, and he did not know "where the financially strapped county was going to get the money" to pay the settlement. *Mississippi Jail Prisoner Wins $3,000,000 in Failure to Protect Suit,* Prison Legal News (Aug. 2008) (brackets omitted).

"malfunctioning doors and conditions at the aging facility." Monique Valeris, *Lewis says he's not pointing blame at McMillin*, WAPT (Aug. 8, 2012).

In 2013, Hinds County Circuit Judge Tomie Green convened a special grand jury to investigate conditions at RDC. The reporting this time centered on safety concerns:

> On Sunday, a SWAT team stormed the facility after a dozen inmates broke out of their cells, in part because of faulty locks. Last week, a group of juveniles flooded a portion of the jail by turning on a fire hydrant. Reports also surfaced that several inmates were stabbed and a number of deputies and jailers sustained minor injuries. In June, one inmate died and another was hurt in a string of violent episodes that also left three deputies with injuries.

Emily Le Coz, *Grand jury probes Hinds jail issues*, Clarion-Ledger (July 26, 2013). The grand jury concluded that RDC was "in a deplorable condition and inadequately staffed." Docket No. 3-4 at 5.

In 2014 and 2015, the U.S. Department of Justice's Civil Rights Division investigated conditions at RDC and the two other facilities that comprise Hinds County's jail system: the Work Center and the downtown jail. Docket No. 3-1. It concluded that the County was violating the Eighth and Fourteenth Amendments by, among other things described in its 29-page report, failing to provide "minimum levels of protection from violence," failing to have "sufficient numbers of trained staff," and incarcerating persons "beyond their court-ordered release dates." Docket No. 3-3 at 2-3. The problems had

6

resulted in "at least three major riots, two alleged homicides, and numerous assaults on prisoners and staff members." *Id.* at 2. The Findings Letter resulted in the Mississippi Department of Corrections moving its state inmates from RDC. *State inmates removed from troubled jail in Hinds County*, Corrections 1 (May 27, 2015). "[W]e believe removing the state inmates is in the best interest of the State of Mississippi and the inmates," said State Corrections Commissioner Marshall Fisher. *Id.*

The Department of Justice filed this lawsuit in 2016. Its complaint described an inability to meet minimum constitutional standards with respect to detainee-on-detainee violence, staff-on-detainee violence, "dangerously low staffing levels," jail policies and procedures, housing and classification systems, the physical plant, internal investigations, detention of persons who should have been released, and the treatment of juvenile and suicidal detainees. Docket No. 1 at 3-5. The Department alleged that the constitutional violations "have been obvious and known to Defendants for a substantial period of time." *Id.* at 5. The Attorney General herself signed the complaint. *Id.* at 7, 10.

The parties immediately entered into a Consent Decree. Docket Nos. 3; 8-1. The Consent Decree required Hinds County to implement dozens of minimal constitutional standards. Hinds County expressly agreed that the Consent Decree was "narrowly drawn, extends no further than necessary to correct the violations of federal rights," and "is the least intrusive means necessary to correct these violations." Docket No. 8-1 at 61.

A Monitoring Team was also established. *Id.* at 54; *see also* Docket No. 10; *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir.

7

1974). It includes Elizabeth Simpson, David Parrish, Jim Moeser, and Dr. Richard Dudley. They are subject-matter experts in corrections, corrections operations, juvenile justice, and corrections mental health, respectively. The Monitors began to provide technical assistance, conduct regular site visits, and serve as the eyes and ears of the Court[3] as the parties attempted to meet the requirements of the Consent Decree.

Hinds County's efforts have borne fruit at one of its jails—the Work Center.[4] The Monitoring Team describes the Work Center as a functional jail for the citizens of Hinds County. *See, e.g.,* Fourteenth Monitoring Report at 29. This Court's own visit to the three facilities in 2019 confirms that something about the Work Center's culture is effective; it largely operates as a jail should.

The story is not the same for RDC.

In 2019, the Department of Justice filed a Motion for an Order to Show Cause outlining a litany of ongoing constitutional violations at RDC. Docket No. 31. It described the County's "continued failure to comply with nearly all provisions of the Settlement, including provisions regarding security, medical screening, suicide prevention, mental health care, youth services, fire safety, sanitary conditions, and release

---

[3] The Consent Decree and Monitoring Team were approved by U.S. District Judge William H. Barbour, Jr. The case was transferred to the undersigned in December 2018 upon Judge Barbour taking senior status. Immediately upon being assigned the case, this Court held a status conference and "received an update as to the progress toward compliance with the Consent Agreement from the parties and the Court Appointed Monitor." *See* Minute Entry of Jan. 15, 2019.

[4] Hinds County's third facility, the downtown jail, was closed in 2020.

8

procedures." *Id.* at 5. As any elementary school child understands, the County was flunking, miserably. The result was rioting, stabbings, a murder, staff-on-detainee assaults, and a "major disturbance" during a Monitoring Team site visit that resulted in eight emergency room transports. *Id.* at 7-8, 14. The Department added that the situation on the ground was "likely worse" than it could adequately summarize because of poor record-keeping at RDC. *Id.* at 8.

The parties again avoided significant litigation by agreeing to a Stipulated Order. *See* Docket Nos. 60 and 60-1; *accord Plata v. Schwarzenegger,* 603 F.3d 1088, 1091 (9th Cir. 2010). This Court grudgingly approved their agreement even though the County had reached sustained compliance "in only one of the 92 requirements of the Consent Decree." Docket No. 60 at 7. "While a finding of contempt is warranted," the undersigned wrote, "the parties' stipulated order outlines what is perhaps the most comprehensive remedial plan for Hinds County to become compliant that the Court has seen from the parties." *Id.* at 11. "Ten months from today, the County should have made significant progress on developing and implementing policies, making repairs to the physical plant and ensuring incarcerated youth have necessary programming, among other necessary investments." *Id.* Monitoring continued; periodic status conferences were held. The facility limped along into the present.

The situation deteriorated significantly in the most recent monitoring period. According to the Fourteenth Monitoring Report,

> There were a record number of fights and assaults at RDC in May [2021], there continue to be fires set by inmates, there is an extremely

9

> large amount of contraband in the facility in-
> cluding drugs, there have been a number of
> overdoses although no deaths from those over-
> doses, and there have been three deaths, two by
> suicide. Although there is some cause for opti-
> mism with the new Detention Administrator
> being hired[5], **this is a very disturbing trend**.

Fourteenth Monitoring Report at 3 (emphasis added). The sit-
uation became more uncertain when Sheriff Vance, the
elected official with primary responsibility for RDC,[6] passed
away unexpectedly on August 3, 2021.

### C.    The 2021 Death Toll

On October 18, 2021, RDC experienced its sixth death of the
year. The Monitoring Team filed an emergency report on Oc-
tober 27 characterizing the pattern of deaths as "especially
alarming." Docket No. 96 at 2 [hereinafter *October 27 Emer-
gency Monitoring Report*].

A brief summary of each death is provided here.[7]

The first death, on March 19, 2021, happened when a nurse
ordered an arrestee to be taken to the hospital and no one

---

[5] The Monitoring Team reports that the Detention Administrator is "very
well qualified." Fourteenth Monitoring Report at 3.

[6] As Sheriff McMillian explained at his OJP testimony, "I am, as Sheriff,
responsible for safely operating the correctional facilities in Hinds County
and take that responsibility seriously." *OJP Testimony* at 445.

[7] The Monitoring Report does not identify these individuals by name. But
for that reason, this Court would have given these individuals the dignity
of referring to each by their name. After all, they deserve respect. Deten-
tion does not strip an individual of his inherent dignity.

10

carried out her order. *Id.* at 2. The arrestee subsequently collapsed. An oxygen concentrator was obtained but would not turn on because the electrical outlet was faulty. Someone ran to get an AED unit from Medical, but the AED unit had no pads. The arrestee died. RDC staff then "took the position that he was not an inmate because he had not been accepted/booked." *Id.* An after-action report has not been completed for this death.[8]

The second death, on April 18, was a suicide by a detainee being housed in a booking cell, a practice "that the Monitoring Team has repeatedly stated should not be done and is contrary to the Settlement Agreement." *Id.* The Officer who discovered the body could not enter the unit because he lacked keys, and the Officer who was supposed to be on duty at booking was not at his post. "The last documented well-being check was made at 1105, more than three hours before the incident." *Id.* No after-action report was completed.

The third death occurred on July 6. It was another death by hanging—although the available record is silent on whether it was a suicide. The Officer charged with performing 30-minute head counts "left the unit" for unknown reasons. *Id.* at 3. When he returned to look in, he did so from a vantage point "from where he could not possibly see each inmate to conduct an accurate count." *Id.* No after-action report was completed.

Death number four was a drug overdose on August 3. "An IAD investigation is still underway, but inmates on the unit

---

[8] An after-action report is a way for officials and monitors to "gather facts, identify problems, examine staff performance, and develop a plan to prevent future" major disturbances. *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *11 (S.D. Miss. June 10, 2015).

11

reported that they had been calling for assistance for five hours and that there had been no response to their cries for help." *Id.* The condition of the body indicated that the detainee had been dead for some time when he was discovered. No after-action report has been completed.

The fifth death occurred the next day, when a detainee died in the hospital from COVID complications. "Although the death appears to be medically related," the Monitoring Team wrote, "there are questions regarding when his symptoms first appeared and whether they were timely and adequately responded to as well as . . . the adequacy of the precautions being taken by the Jail to prevent the spread of the virus." *Id.* No investigation into his death was conducted.

The sixth death, on October 18, was an assault in a unit where the doors do not lock and staff supervision is "minimal." *Id.* The Monitors' description relayed the following:

> At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later.

*Id.* at 3-4.

12

The Monitoring Team concluded its Emergency Report with a recommendation "that the Court set a status conference/hearing to address immediate measures that need to be taken to address the concerns raised above and prevent the future loss of life." *Id.* at 5.

On November 10, the Detention Administrator submitted her letter of resignation. She described "a distinct lack of support" and relayed in detail a recent directive from the Interim Sheriff that she found "reckless and dangerous." She had served for a total of only five months before submitting her letter of resignation.

This Order followed.

## II.    Law

### A.    Consent Decrees

"A consent decree is akin to a contract yet also functions as an enforceable judicial order." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Consent decrees are commonly used to address ongoing constitutional violations in jail and prison cases. *E.g., Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *3 (S.D. Miss. June 10, 2015).

Although "state and local authorities have primary responsibility for curing constitutional violations," *Hutto v. Finney*, 437 U.S. 678, 687 (1978), "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew*, 540 U.S. at 440.

13

### B.    Civil Contempt

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

To hold a respondent in civil contempt, the moving party must prove by clear and convincing evidence: "(1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987).

"The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). That means "[g]ood faith is not a defense to civil contempt." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

"If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Frew*, 540 U.S. at 440 (citation omitted); *see also Am. Airlines*, 228 F.3d at 585.

### C.    Receiverships

"[R]eceiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Plata*, 603 F.3d at 1093–94 (collecting cases).

A "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution.'" *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (quoting Wright & Miller). In the prison context specifically, receiverships can be necessary

14

"to run institutions where constitutional violations [are] occurring. Such receiverships are generally ordered in the context of ensuring a governmental entity's compliance with court orders." *Id.* at 306 (collecting cases).

In *Plata,* a receivership was imposed "after the State admitted its inability to comply with consent orders intended to remedy the constitutional violations in its prisons." 603 F.3d at 1097.

> The court imposed the receivership not because it wanted to, but because it had to. After attempting less drastic remedies, and after long periods of working closely with State authorities to try to bring them into compliance with the orders to which they had stipulated, the district court justifiably concluded that the State's personnel simply could not or would not bring the State into constitutional compliance in the foreseeable future.

*Id.*

### D.    Other Remedies

Judges have occasionally taken creative measures to enforce consent decrees.

In a famous case in Alabama, Judge Frank M. Johnson, Jr. appointed the Governor to serve as the receiver and bring the correctional facilities into compliance. *Newman v. State of Ala.,* 466 F. Supp. 628, 635 (M.D. Ala. 1979); *see also* Jack Bass,

15

Taming the Storm 342 (1993).[9] "Time does not stand still, but the Board of Corrections and the Alabama Prison System have for six years," the Judge wrote. *Newman*, 466 F. Supp. at 635. "Their time has now run out." *Id.*

Decades later, New Orleans is presently struggling to implement a consent decree regarding its local jail. The United States moved for an Order to Show Cause. The parties negotiated and agreed to appoint an "Independent Jail Compliance Director" to "temporarily assume the duties and authority of the Sheriff as to all aspects of the jail's operations." *Jones v. Gusman*, 515 F. Supp. 3d 520, 530 (E.D. La. 2021). Control was returned to the sheriff four years later. *See* Nicholas Chrastil, *Sheriff Marlin Gusman to regain control of New Orleans jail*, The Lens (Aug. 5, 2020).

Unfortunately, a recent order reflects the district court's frustration with the subsequent lack of progress:

> The City, over many years and through multiple administrations, has been promising to abide by its obligation to implement a durable solution to the problem of housing special populations in the jail – to provide "a good and sufficient jail." Yet here we are in late 2020 with little to nothing to show for years of discussion, debate, handwringing, empty promises, and court orders regarding the treatment of special-needs inmates.

---

[9] Judge Johnson's successor, Judge Robert Varner, later held the Alabama Attorney General in contempt of court for interfering with implementation of the remedial order. Bass at 343.

16

*Jones*, 515 F. Supp. 3d at 525.

Receiverships are not the most drastic action a court can take to remedy persistent jailhouse constitutional violations. In one case, the Michigan Court of Appeals observed that the presiding judge could have simply "closed the jail until the final judgment was fully implemented." *Wayne Cty. Jail Inmates v. Wayne Cty. Chief Exec. Officer*, 178 Mich. App. 634, 660–61 (1989); *accord Newman*, 466 F. Supp. at 635 ("There is, of course, a more extreme alternative to a receivership. . . . [F]ailure to comply with the minimum standards set forth in the order would necessitate the closing of several prison facilities.").

Risks to public safety would be minimized, if not outright eliminated, if detainees were simply housed in functioning jails operated by neighboring or co-extensive jurisdictions. Indeed, in the New Orleans litigation, the parties reached an agreement with the State of Louisiana to house certain detainees at a state facility pending construction of a new local jail.[10] *Jones*, 515 F. Supp. 3d at 532.

### III.    Discussion

The concerns with RDC are known all too well. Years of detailed reports from the Monitoring Team document the problems with precision.

What follows are some of the most significant problems observed in the Thirteenth Monitoring Report, the Fourteenth

---

[10] The Court, however, is not oblivious to the issues being litigated concerning the alleged constitutional deprivations occurring in Mississippi's state prison system. *See Amos v. Cain*, No. 4:20-CV-7-DMB-JMV, 2021 WL 1080518 (N.D. Miss. Mar. 19, 2021).

Monitoring Report, the September 15 Status Conference, and the October 27 Emergency Monitoring Report.[11]

### A.  Six People Have Died This Year

The deaths were described in detail above. It is troubling that they happened in the first place, and it is troubling how the County has responded—or failed to respond.

Violence at RDC is not new. *E.g.*, *Johnson v. Burnly*, No. 3:15-CV-881-CWR-FKB, 2018 WL 1341727, at *4 (S.D. Miss. Feb. 9, 2018) ("Shortly after he was transferred to Raymond, Johnson claims that a group of inmates entered his cell, assaulted him, and stabbed him."). The problem is its recent escalation with no end in sight. The loss of life cannot continue.

### B.  The Jail Is Severely Understaffed

The First Monitoring Report got right to the point: "The over-arching problem facing the Hinds County Jail System is the inability to hire and retain enough qualified personnel (deputies) to staff required positions." Docket No. 12-1 at 2. "**No matter what other steps are taken to address operational problems within the facilities**," it concluded, "compliance with conditions of the Settlement Agreement **cannot be achieved** until this matter is successfully addressed." *Id.* (emphasis added). Years later, a January 2020 Order found that "RDC has less than half of the staff it needs to run safely." Docket No. 60 at 6.

Now in late 2021, the problem remains unresolved. Hinds County presently has 229 employees for a jail system that requires 318 employees. Fourteenth Monitoring Report at 3.

---

[11] *See* Docket Nos. 83, 94, 95, and 96.

This failure has consequences. As the Monitoring Team explained,

> the C-Pod housing units are routinely left unattended. Consequently, the number of assaults and fires, as well as the amount of contraband found during shakedowns, is as high in C-Pod as it is in A-Pod where staffing is so low that, on occasion, the only officer present is stationed in the control room.

*Id.* at 3-4. The staffing failure has also "resulted in a continuing series of major maintenance problems as inmates destroy the work of County and contract personnel almost as fast as it is completed." *Id.* at 3.

### C.     RDC Is at Risk of Burning Down

Indifference to fire safety remains a life-threatening concern. The Monitoring Team reports that there is no fire alarm system in the facility, no sprinkler system in the inmate housing areas of RDC, and that the sprinkler system at the Work Center is only now working after years of not functioning. Docket No. 83 at 3 [hereinafter *Thirteenth Monitoring Report*]; Fourteenth Monitoring Report at 4; *see also Gates*, 501 F.2d at 1300 ("there is a lack of adequate fire fighting equipment making it, as stated by the Penitentiary Superintendent, 'almost impossible to put out a fire at Parchman.'").

This problem is exacerbated by the number of fires at RDC. One illustrative incident report shows that inmates set three separate fires in a one-hour time frame, without any officers present in the area. *See* Fourteenth Monitoring Report at 29.

19

The potential ramifications are obvious and devastating. Still, the County has failed, if not refused, to take meaningful corrective action at RDC.

### D.     The Cell Doors Don't Lock

It has long been known that many of the security doors and locks at RDC are not functional. *See* Part I.B, *supra*. As best explained in the Sixth and Seventh Monitoring Reports, the control system for security doors is beleaguered by electrical and mechanical problems, rendering it inoperative. Docket Nos. 24 at 34; 27 at 33.

This is particularly pronounced when it comes to cell doors. *See* October 27 Emergency Monitoring Report at 4 (stating that "[h]ousing inmates in units where cell doors do not lock" is an ongoing life-threatening safety issue). Because the manual locks are located on the outside of the cell, if an officer enters a cell, he must leave the cell door propped open. Docket No. 27 at 33. Otherwise, the officer risks being locked in the cell. Of course, this is a two-fold issue as it also presents the inmate a way out. Even so, many of the cell doors simply do not lock at all. *Id.* Inmates can open and close the door, enter and exit, as opportunity permits.

It is true that some of the cell doors have been repaired in recent years. As it stands, however, the Fourteenth Monitoring Report and the October 27 Emergency Monitoring Report show that the doors remain in an unacceptable state of disrepair. *See* Fourteenth Monitoring Report at 2; October 27 Emergency Monitoring Report at 4.

### E.     "Trash Dumpster Cells"

Well over a year ago, the Monitoring Team reported that a handful of cells had become trash receptacles. *See* Thirteenth

20

Monitoring Report at 3; *see also* Fourteenth Monitoring Report at 4, 30. These "trash dumpster cells" were damaged cells that RDC chose to weld shut rather than repair. Inmates, meanwhile, were able to deposit trash through the cells' broken windows. As a result, the cells served "as a breeding ground for vermin." Fourteenth Monitoring Report at 4.

Since this issue was brought to the attention of RDC, the number of trash dumpster cells **increased** to 30. *Id.* Only recently have some of the cells been emptied and cleaned, while the majority remain welded shut, awaiting repairs. *Id.* There is no indication as to whether measures have been taken to avoid the same problem from happening again.

"Trash dumpster cells" are one of several unsafe and unsanitary housing conditions. *See* Thirteenth Monitoring Report at 3-4 (reporting on issues with heating, ventilation, and air conditioning, as well as non-functioning lights which left detainees primarily living and operating in darkness for long periods of time); Fourteenth Monitoring Report at 54 (finding that the HVAC system at RDC "has been allowed to degenerate to the point that replacement is a more viable alternative than repair.").

### F.    Unreasonable Levels of Drugs and Contraband

The Monitoring Team reports that increased quantities of drugs have contributed to "a recent upsurge in serious drug overdoses and other drug reactions." Fourteenth Monitoring Report at 5. The rise in opiate abuse is especially worrisome. *Id.* Failure to eliminate the importation of contraband, including opiates, into RDC raises the risk of additional fatal drug overdoses. Such results are as tragic as they are preventable.

21

Recent shakedowns reveal that "almost half of the inmates in a housing area have contraband cell phones, excessive amounts of illicit drugs, shanks and even cash." *Id.* at 54. Contraband comes in through a variety of channels. Some detainees escape the facility solely to transport "the contraband back in." September 15, 2021 Status Conference Transcript, Docket No. 95 at 34; *see also* Docket No. 60 at 5 ("In one incident described in Monitor's June 2019 report, two prisoners were found outside RDC, not to escape but to recover three bags of contraband to bring back into the facility."). Members of the public also bring contraband in by, for example, throwing it over the fence. Sept. 15 Tr. at 34. Staff also smuggle contraband into the facility. *See id.* at 35 (observing that "the sheriff's office has been proactive in taking disciplinary action and firing and charging people who they have found who have done that.").

### G.     Inadequate Medical and Mental Health Care

By all accounts, RDC's management of medical and mental health care remains abysmal. As the above discussion indicated, *see* Part III.A, *supra*, RDC fails to adequately respond to medical emergencies and deaths.

Many of the issues related to inadequate provision of medical and mental health care stem from perennial staffing shortages. *See* Fourteenth Monitoring Report at 32; *see also* Part III.B, *supra*. Personnel shortages often impede, or prevent outright, the provision of medical and mental health services, including scheduled visits and necessary follow-up care. Fourteenth Monitoring Report at 34. Indeed, as a result of these failures, staff report that "procedures performed during medication pass have to be postponed or even canceled," or are completed haphazardly. *Id.* "[T]here is no mechanism for

22

reporting, keeping track of, and/or quantifying" these failures. *Id.*

Mental health integration also remains poor. For instance, "mental health staff are not involved in the decision to place someone in segregation whether disciplinary or administrative." *Id.* at 81. RDC also fails to integrate mental health staff in forensic evaluations conducted by the state mental hospital via telepsychiatry. *Id.* at 114. This, despite the continual increase in the number of detained individuals with mental health needs, including "a larger percentage of extremely unstable, acutely ill detainees." *Id.* at 5.

An incident this summer involving a youth detained at RDC is illustrative. Senior Circuit Judge Green initially transferred the youth from Henley-Young to RDC, asserting that RDC was better equipped to respond to the youth's "numerous attempts of self-harm and suicide attempts." Docket No. 90 at 1. Tragically, though, the youth again attempted suicide at RDC. *Id.* at 2. Multiple subject matter experts from the Sheriff's Office responded by stressing that "'neither RDC nor Henley-Young offer appropriate facilities for the mental health needs of this minor.'" *Id.* at 4. The youth was ultimately transferred to a state facility better equipped to support his mental health needs. His situation highlights the lack of appropriate mental health supports at RDC.

### H.    Over-reliance on Chemical Spray

The Monitoring Team indicates that "chemical spray is still being used to coerce compliance." Fourteenth Monitoring Report at 26. Such usage violates the Use of Force policy, which "explicitly requires that chemical spray be used as a defensive

23

measure, not as a tool to coerce compliance with officers' orders." *Id.*

Chemical spray incidents also suggest inadequate supervision. *Id.* at 56. Prior reports note that officers who inappropriately used chemical spray later received the approval of their supervisors, who "signed off on the reports." Thirteenth Monitoring Report at 25. Indeed, "the Internal Affairs investigator exonerated the officers." *Id.* This conduct is unacceptable.

As underscored by the Monitoring Team, RDC should develop procedures whereby staff must receive supervisory approval for using chemical spray. *Id.* Following use of chemical spray, staff must produce a use of force report, which should include a description, as well as the number of discharges, of the chemical munition cannisters used in the incident. *Id.* at 58, 61. Most importantly, though, RDC must abate reliance on chemical spray as a coercive measure.

## I.    Detainees Run Parts of the Jail

The First Monitoring Report from 2017 was crystal clear: the lack of staffing "has left prisoners in charge, which resulted in riots, prisoner deaths and major structural damage to the facility." Docket No. 12-1 at 2.

The consequences of detainee control were on full display during three riots in June 2019. A previous Order recited how "prisoners effectively took over one of the three pods that make up RDC." Docket No. 60 at 3.

> The prisoners threatened to stab officers with shanks and took their keys. At some point, officers barricaded themselves into a control room for their safety – ceding control of the pod until

24

help arrived. The officers planned to retreat into the control room's bathroom should the prisoners breach the control room door, which thankfully did not occur.

*Id.*[12] The risks persisted in the most recent monitoring period. The Lieutenant in charge of booking and classification reported that some detainees "have developed their own committee system in which they choose who is accepted into their unit." Fourteenth Monitoring Report at 30. A-Pod in particular was described as "unmanageable." *Id.*

In one troubling incident, the control room officers of A-Pod and C-Pod both left their assigned posts. *Id.* at 33. The control rooms were unattended. Detainees could have "easily take[n] over the control rooms and release[d] the entire inmate population at the RDC." *Id.* There is no telling if or when detainees might again take control of a pod, or in fact release everyone held at RDC.

### J.    COVID Continues to Be a Challenge

Since the onset of the COVID-19 pandemic, this Court has been in communication with the County about implementing adequate measures to protect detainees and staff. *See United States v. Hinds Cty.*, No. 3:16-CV-489-CWR-JCG, 2020 WL 1892259, at *1 (S.D. Miss. Apr. 16, 2020).

Unfortunately, as recent as the Fourteenth Monitoring Report, there were still "few to no opportunities [] to quarantine or isolate individuals who have tested positive or who have been exposed to positive individuals within the jail system."

---

[12] This Court has previously condemned prisons officials for ceding control of the prison to the inmates. *See Depriest*, 2015 WL 3795020, at *13-14.

Fourteenth Monitoring Report at 2. The facility remains "at high risk for a spike in infections." *Id.*

The COVID challenge illustrates an ongoing theme with Consent Decree compliance: RDC adopts policies yet fails to implement mechanisms to ensure that the policies are enforced. This was particularly apparent during the Court's last status conference. The Attorney for the Sheriff's Office represented that per RDC policy, all staff must be either vaccinated or tested for COVID-19 on a weekly basis. When pressed for detail, however, counsel could not point to any mechanism of enforcement, and simply retorted, "that is the policy." Sept. 15 Tr. at 63. She finally acknowledged, "Do I represent to the Court that this may or may not be done 100%? We don't know because it's a new policy[.]" *Id.*; *see also* Fourteenth Monitoring Report at 59 (noting that staff are "not able to articulate . . . meaningful knowledge" of the Use of Force policy that went into effect 18 months earlier).

### K.   RDC Detains Persons Adjudicated "Not Guilty"

A fundamental principle of corrections is that persons should be detained only as long as necessary to resolve the charges against them. Accordingly, RDC is required to release individuals found not guilty, acquitted of charges, or who have the charges against them dismissed, provided that they are not held on any other matter. Fourteenth Monitoring Report at 115.

Presumably, the only detainees housed at RDC are those who have failed to meet their bond obligations or are not entitled to bond, as one generally has the federal constitutional right to bond. *See United States v. Salerno*, 481 U.S. 739, 755 (1987). ("In our society liberty is the norm, and detention prior to trial

26

or without trial is the carefully limited exception."). The Mississippi Constitution also recognizes this right. As the Mississippi Supreme Court has explained, "there is a non-discretionary right to bail before conviction for all offenses, except those offenses punishable by death. . . . The Constitutional right to bail before conviction, less the exception, has become so fundamental that it is favored by the public policy of this State." *Lee v. Lawson*, 375 So. 2d 1019, 1021 (Miss. 1979). The Court cannot overlook this principle, which affords each detainee the presumption of innocence.

RDC nevertheless routinely fails to release individuals found not guilty, acquitted, or who have the charges against them dismissed. Fourteenth Monitoring Report at 115-16. The Monitoring Team counsels that "the courts will need to develop the capability to provide a written release order in the courtroom for an individual to be released from court." *Id.* at 116. But RDC also needs to develop a means of identifying and releasing those for whom no lawful basis of detention exists. *Id.*

27

## IV.    Conclusion

The Supreme Court has affirmed extraordinary federal intervention into correctional operations where constitutional violations persist "for years" and "remain uncorrected." *Plata*, 563 U.S. at 499. The record suggests that is the case today.

Within 21 days, Hinds County shall show cause and explain why it should not be held in civil contempt and why a receivership should not be created to operate RDC. A hearing will be scheduled shortly thereafter.

**SO ORDERED**, this the 23rd day of November, 2021.

s/ CARLTON W. REEVES
*United States District Judge*

28



No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL,

*Defendant.*

ORDER

Before CARLTON W. REEVES, *District Judge.*

Before the Court is the United States' request to postpone the Prison Litigation Reform Act (PLRA)'s automatic stay for an additional 60 days. Docket No. 114 at 32-35.

A motion to terminate filed under the PLRA triggers an automatic stay of the challenged prospective relief. 18 U.S.C. § 3626(e)(2). The stay begins 30 days after the motion's filing date and continues until the Court rules on the motion. *Id.* The

Court, however, may postpone the stay for "not more than 60 days for good cause." *Id.* § 3626(e)(3).

Hinds County filed its motion to terminate on January 21, 2022. Docket No. 111. In it, the County requested that the Court consolidate the PLRA evidentiary hearing with a Civil Contempt hearing already scheduled for February 14, 2022. Docket No. 112 at 6 n. 9. This Court allotted the Parties an additional week to accommodate Hinds County's request. The automatic stay, however, is presently scheduled to begin on February 20, 2022, *i.e.,* in the middle of the proceedings to hear this very motion. Thus, the United States argues that good cause exists to postpone the stay for another 60 days. The County does not oppose the postponement.

As to good cause, the United States points to "(1) the evidence of a current constitutional violation and resulting harm; and/or (2) the complexity of the issues that Defendants' termination motion involves." Docket No. 114 at 32. Citing the ongoing coronavirus pandemic, the County responds that it "takes no position as to whether 'good cause' exists to extend the automatic stay." Docket No. 116 at 20.

The PLRA does not define good cause. Rather, it simply provides that "[n]o postponement shall be permissible because of general congestion of the court's calendar." 18 U.S.C. § 3626(e)(3). The Supreme Court, however, has described the "'good cause' standard" as "relatively generous." *Miller v. French,* 530 U.S. 327, 340 (2000).

Most district courts to consider the issue have required a simple showing of some "evidence of ongoing constitutional violations." *Braggs v. Dunn,* No. 2:14-CV-601-MHT, 2020 WL 5735086, at *4-5 (M.D. Ala. Sept. 2020) (collecting cases). Other

2

courts employ a higher standard, demanding "demonstrated widespread disregard for the provision" of some constitutional right. *Merriweather v. Sherwood*, 235 F. Supp. 2d 339, 347 (S.D.N.Y. 2002). Courts generally decline to apply this more exacting inquiry, however. *See S.H. Reed*, No. 2:04-CV-1206, 2012 WL 13118333, at *3 (S.D. Ohio Dec. 28, 2012) ("Since the *Merriweather* standard appears to conflict with the plain language of the PLRA, this Court does not adopt it.").

Under either standard, the Court finds that this case qualifies for a 60-day postponement. The Monitoring Team's reports, the Court's Order to Show Cause [Docket No. 100], and the Court's visit to RDC on January 24, 2022 provide "a strong indication in the record that an ongoing constitutional violation persists." *Balla v. Idaho State Board of Correction*, No. 1:81-CV-1165-BLW, 2019 WL 9831023, at *1 (D. Idaho Mar. 28, 2019). Indeed, the existing record provides compelling evidence of multiple ongoing constitutional violations. *See* Docket No. 100. Such evidence warrants postponing the automatic stay. The complexity of the issues in this case also justifies postponement. *See Braggs*, 2020 WL 5735086 at *4

The approach of the District Court for the Middle District of Alabama in *Braggs* is instructive. In granting a 60-day postponement to the mandatory stay under the PLRA, the *Braggs* Court emphasized that

> The evidentiary burden on the plaintiffs to compose a defense of these orders, the breadth and complexity of the remedial relief on which the plaintiffs must now seek discovery, and the compressed schedule the PLRA sets forth— compressed further by the uncertainty regarding the intended scope of the defendants'

3

> motion—convince the court that the circum-
> stances here meet the "relatively generous"
> good cause threshold of § 3626(e)(3).

2020 WL 5735086, at *2.

Similar factors weigh in favor of postponement in the present case. Indeed, the complexity of the underlying issues discussed above, as well as the need to allow the Court to fully consider the testimony offered during the February 2022 hearings, counsel in favor of postponing the stay.

Now, the County claims that the present hearing schedule affords insufficient time to present evidence on the issues. *See* Docket No. 121. The Court will rule on the County's motion to continue in due course. But, in consideration of these and other factors addressed above, the Court now finds that the full 90-day postponement of the automatic stay under the PLRA is warranted.

Accordingly, the mandatory stay under the PLRA is postponed until April 21, 2022.

**SO ORDERED**, this the 4th day of February, 2022.

s/ CARLTON W. REEVES
*United States District Judge*

4



No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.

*Defendants.*

SECOND ORDER OF CONTEMPT

Before CARLTON W. REEVES, *District Judge.*

For the reasons that follow, Hinds County is again held in contempt of court.

## I.  Factual and Procedural History

The factual and procedural history of this case is, by now, well-known. A brief summary of the present situation will do.

The United States brought this suit to end unconstitutional conditions of confinement at Hinds County's Raymond Detention Center. In 2016, the County agreed that the conditions

were unconstitutional and entered into a Consent Decree to remedy the problems.

Since then, compliance has been elusive. Court-appointed independent monitors report that Hinds County is in sustained or substantial compliance with only three of 92 requirements of the Consent Decree. Problems remain with staffing, use of force, basic living conditions, and over-detention, among other issues. Today's Order, though, is about A-Pod.

Among a long string of broken promises, Hinds County vowed to no longer house detainees in A-Pod. The February 2022 Evidentiary Hearing, however, revealed that not only are detainees still being housed in A-Pod, but that is where they will remain indefinitely.

By way of brief background, pursuant to the Stipulated Order, the County is required to renovate all of the Pods used for housing. Many of these deadlines have long passed, and renovations are still not complete. Initially, B-Pod was cleared to complete its renovations, and the plan was to then transfer all detainees in A-Pod to B-Pod, and close A-Pod for good. *See* Docket no. 101 at 28 [hereinafter Fifteenth Monitoring Report]; *see also* Tr. vol. 1 at 93, 95-96.

Recently, however, the County has decided otherwise.

In August, it began to re-populate B-Pod before the renovations were complete. Since then, the County has decided to maintain at least two housing units in A-Pod indefinitely. *See* Tr. vol. 1 at 93, 95-96; *see also* Fifteenth Monitoring Report at 28. In violation of the Stipulated Order, the County has blown through every deadline related to A-Pod and has no plans to renovate it. *See* Fifteenth Monitoring Report at 28 ("Not only does the County have no plan for renovating A-Pod, but the

additional personnel required to operate any of A-Pod under direct supervision conditions is well beyond the current staffing level.").

To be clear, the County is out of compliance with a number of provisions in the Stipulated Order, but A-Pod is in a particularly egregious state. The living conditions, or lack thereof, and near-complete lack of supervision, have contributed to lawlessness in that part of the facility.

This was plainly illustrated by a death in A-Pod on October 18, 2021. The Monitors described the events as follows:

> At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later.

Docket No. 96 at 3-4 [hereinafter October 27 Emergency Monitoring Report].

On November 23, 2021, concerned by a string of deaths and Jail Administrator Major Kathryn Bryan's resignation, this Court issued an Order to Show Cause directing the County to explain why it should not be held in contempt of court and why a receivership should not be imposed to run RDC.

3

On February 4, 2022, the Court issued its First Order of Contempt. It found that Hinds County was patently non-compliant with more than two dozen provisions of the Consent Decree. A remedy was withheld pending further proceedings.

From February 14 to March 1, the Court held an Evidentiary Hearing regarding its Order to Show Cause and the County's motion to terminate the July 2016 Consent Decree pursuant to the Prison Litigation Reform Act.

At the hearing, there was substantial evidence concerning the plight of A-Pod. Testimony focused on the County's decision to keep it opened, un-renovated, and not under direct supervision, in violation of the Consent Decree and Stipulated Order.

As Mr. David Parrish, one of the Court's Monitors, testified,

> A-Pod is a disaster. It's filthy; lights don't work; locks don't work; doors can't be secured; cells don't have lights inside them. Inmates since they can't even close the doors, end up hanging blankets down in front of them to have make-shift privacy to their cells. Showers don't work. Everything in the place is torn up. It's just a very bad mess. There's no fire extinguishers inside, of course, because the inmates control that place. There are no officers who work inside the housing units in Alpha. There are no fire hoses. There are not even fire hoses out in the corridors, around the control room in Alpha. That area is ill equipped across the board.

4

Tr. vol. 1 at 96. In this very hearing, the Sheriff himself admitted that A-Pod is unsafe. *See* Tr. vol. 10 at 1930 ("I would consider A-Pod to be unsafe.").

As instructed in *Brown v. Plata*, an institution that deprives detainees of the minimal civilized measure of life's necessities is "incompatible with the concept of human dignity and has no place in civilized society." 563 U.S. 493, 511 (2011). And where officials fail to fulfill their obligations, "the courts have a responsibility to remedy the resulting Eighth Amendment violation. . . . Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.*

This Order followed.

## II.     Law

### A.     Consent Decrees

"A consent decree is akin to a contract yet also functions as an enforceable judicial order." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Consent decrees are commonly used to address ongoing constitutional violations in jail and prison cases. *E.g., DePriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *3 (S.D. Miss. June 10, 2015).

Although "state and local authorities have primary responsibility for curing constitutional violations," *Hutto v. Finney*, 437 U.S. 678, 687 (1978), "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew*, 540 U.S. at 440.

## B.    Civil Contempt

"Civil . . . contempt is a sanction to enforce compliance with an order of the court." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (citations omitted). Courts have inherent power to enforce their orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). As for consent decrees, courts have "the power to enforce and modify the terms of the decree and to penalize the noncomplier through contempt proceedings or the issuance of injunctive relief." *B.H. v. McDonald*, 49 F.3d 294, 300 (7th Cir. 1995).

To hold a respondent in civil contempt, the moving party must prove by clear and convincing evidence: "(1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987).

"The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). That means "[g]ood faith is not a defense to civil contempt." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002). "An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently." *McComb*, 336 U.S. at 191.

"If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Frew*, 540 U.S. at 440 (citation omitted); *see also Am. Airlines*, 228 F.3d at 585.

6

### III.   Discussion

The first two elements of the civil contempt standard are satisfied. A Court Order was in effect that required certain conduct of Hinds County. The County agreed to a judicially-enforceable contract when it voted to enter into the Consent Decree and Stipulated Order.

The remaining element asks whether Hinds County failed to comply with the Court Orders. The answer is "yes." The below sections explain why.

### A.   Gang Committees

Confinement in a jail "where terror reigns" is cruel and unusual punishment. *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (overruled on other grounds by *International Woodworkers of America, AFL-CIO and its Local No. 5-376 v. Champion Intern. Corp.*, 790 F.2d 1174 (5th Cir. 1986)). "[P]rison officials have a duty . . . to protect prisoners from violence at the hand of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offense against society." *Id.* at 834. "Specifically, failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment." *Stokes v. Delcambre*, 710 F.2d 1120, 1122 (5th Cir. 1983). Put another way, terror reigns where "officials permit violent offenders to hold sway over part or all of the facility — creating 'a pervasive risk of harm and a failure to take reasonable steps to prevent the known risk'" *Anderson v. Morris*, No. 4:16-CV-101-DMB-JMV, 2017 U.S. Dist. LEXIS 159954, at *12 (N.D. Miss. July 18, 2017) (quoting *Stokes*, 710 F.2d at 1120).

7

That is the case with A-Pod. *See e.g.*, Tr. vol. 1 at 96 (Mr. Parrish testifying that "Inmates control A-Pod."); *see also, e.g.*, Tr. vol. 11 at 1930 (Sheriff Tyree Jones admitting that he "would consider A-Pod to be unsafe.").

The detainees in A-Pod have established "gang committees" or "inmate committees" that "essentially run the unit and . . . decide if there's someone on the unit that they don't want on the unit." Tr. vol. 3 at 460; Tr. vol. 6 at 1096; Tr. vol. 8 at 1404. The committees coordinate attacks on unwelcome detainees (*i.e.*, "they will harass, steal from, assault that inmate") until the detainee requests to be moved. Tr. vol. 8 at 1404.

The Fifteenth Monitoring Report details two such incidents:

> In [Incident Report] #211384, the officer stated that a detainee was being put out of A-4 by other detainees. They placed his property by the gate. He was moved to C-2. Again, in [Incident Report] #211385 in A-3, several detainees called the officer over to say that two other detainees had to be moved. They then beat one of the detainees. It is not clear from the report if and where the detainees were moved.

Ultimately, the committees direct detainees' housing placements—and security staff comply. The moves contravene the jail's classification system and violate paragraph 42(f) of the consent decree. Tr. vol 6 at 1096; *see also* Fifteenth Monitoring Report at 34-37. Gang activity within a correctional facility, as this Court has noted previously, can lead to riots, underreporting of assaults and other crimes and gang-imposed discipline. *Depriest*, 2015 WL 3795020, at 13.

8

It is undisputed the committees also decide who eats and who doesn't eat. *See* Tr. vol. 6 at 1124. Because officers have delegated some of their duties to detainees themselves, such as meal distribution, the committees withhold meals from some detainees. *Id.* This practice is incompatible with the jails' Eight Amendment obligation to at the very least, provide "basic sustenance." *Brown*, 563 U.S. at 510-11.

These behaviors are enabled by the County's decision to use "gang pods," or grouping detainees in housing units based on their gang affiliation. *See* Fifteenth Monitoring Report at 35. This practice was once abated but is again prevalent. *Id.* Paragraph 42(f) of the consent decree requires an end to this practice, but the County has not complied.

## B.     Unprecedented Violence

It is well-established that violence is pervasive at RDC. At the February 22 Evidentiary Hearing, Mr. Parrish testified to "an excessive number of assaults," such that violence is "a constant ongoing problem throughout the Raymond Detention Center." Tr. vol. 1 at 103. Ms. Simpson calculated that 77 assaults were reported between October 2021 and January 2022. Tr. vol. 2 at 289. This figure breaks down to "about 20 [assaults] per month, one of them being an assault that resulted in the inmate being beaten to death." *Id.* at 104.

The violence is not exclusive to A-Pod—but based on the assaults that are actually reported by staff, many of these assaults occur in A-Pod. *See* PX-32. One detainee's numerous violent encounters, and staff's inept handling of the threat, is revealing.

On July 5, 2021, in A-Pod, Unit 1, a detainee was stabbed. *See* PX-32 at 88; *see also id.* at 99. The event resulted in a rapid

9

notification and required medical transport, which both indicate that it was likely serious in nature. *See* PX-32 at 88. In the corresponding incident report, there is reference to an earlier assault involving the same detainee for which there is no incident report. *See* Fifteenth Monitoring Report at 46.

On December 1, 2021, the same detainee, on the same housing unit, was stabbed again. *See* PX-88 at 126. The corresponding incident report reflects that after this incident, the detainee was transported to medical, and then returned to the same housing unit. At this point, the detainee has been the victim of at least three assaults, two of which were stabbings. Yet, as noted by the Monitor, he has been placed on the same housing unit again and again. *See* Fifteenth Monitoring Report at 46; *see also* PX-32 at 99.

Even knowing as much as the undersigned does, the full scale of violence is understated.

First, staff do not report all incidents. *See* Fifteenth Monitoring Report at 46 ("Inmate on inmate assaults continue at a high rate. Particularly concerning is the indication that many assaults go unreported.").

Second, where incidents are reported by staff, the reports often lack sufficient information, fail to indicate the location of the incident, and are mislabeled. *See id.* at 75; *see also* Tr. vol. 1 at 224 (Mr. Parrish testifying "That's been a long-standing problem, that incident reports are, in my words, mislabeled. They're titled with the wrong thing. It may reflect disorderly conduct or something like that when it's actually an assault of one person on another or that sort of thing.").

Third, because detainees, especially in A-Pod, are "left unattended throughout the day and night," many assaults just go

unreported. Fifteenth Monitoring Report at 31, 46. To the extent officers learn of the violence, it is most often after the fact. *Id.* at 31. For example, Ms. Simpson highlights one Incident Report where "staff were informed of an assault and the need for protective custody for an inmate in A-1 by the inmate's wife and his attorney who called the Jail with this information. That is how staff located the injured inmate and sent him to the hospital for treatment." *Id.* at 29.

The Court has the very real sense that we have not begun to grasp the extent of violence detainees are subject to at RDC. *See also, e.g.,* Fifteenth Monitoring Report at 28 (Monitor describing an Incident Report in which "[i]nmates in A-2 told the Detention Officer serving breakfast that they were in fear of their lives and asked to be moved[,]" as a "commonplace occurrence.")

### C.      Staff Refuse Shifts in A-Pod Due to Fear of Violence

A-Pod housing units are routinely left unattended. As Mr. Parrish testified, "on Monday, the first day of my most recent site inspection, when we went into Alpha Pod, there was one officer working in the whole pod in the control room. There were no officers on the floor for all four housing units. None." Tr. vol. 1. at 98. This remote surveillance approach violates the Consent Decree's requirement for direct supervision and contributes to continuous damage of the facility and violence within the facility. *See* Tr. vol. 11 at 2085-87.

Yet, this does not seem likely to change soon, considering staff members are afraid to work certain housing units and refuse to go into them. Indeed, staff reportedly "call out sick or just not show up for work" because they are "afraid to work a pod." Tr. vol. 3 at 407.

11

Ms. Priscilla Dawson, the Quality Assurance Coordinator, described this firsthand:

> After visiting that area, talking about A-Pod Unit 1, it was clear why some female staff were apprehensive about entering the unit. This was the only unit I did not enter because I did not feel comfortable doing so even though I had male staff accompanying me. A few of the detainees made lewd and crude remarks and generally acted out. My visit to this unit ended abruptly.

PX-106 at 6.

Current staffing numbers are the lowest they have ever been. *See* Tr. vol. 1 at 123, 134. Turnover is significant. Even basic recommendations to increase retention, such as instituting bi-weekly pay rather than monthly pay, and providing direct deposit, have been rejected. *Id.* at 135-36. Despite spending nearly six years under the Consent Decree, the County appears unwilling or unable to abide by its requirements.

### D.     Still, the Cell Doors Don't Lock

It has long been known that many of the security doors and locks at RDC are not functional. As best explained in the Sixth and Seventh Monitoring Reports, the control system for security doors is beleaguered by electrical and mechanical problems, rendering it inoperative. Docket Nos. 24 at 34; 27 at 33.

This is particularly pronounced when it comes to cell doors. *See* October 27 Emergency Monitoring Report at 4 (stating that "[h]ousing inmates in units where cell doors do not lock" is an ongoing life-threatening safety issue). Inmates can open and close the door, enter and exit, as opportunity permits. In

12

A-Pod, where majority of the cell doors do not lock, detainees are largely permitted to roam as they please. This presents substantial risks to detainees and staff alike.

It is true that some of the cell doors have been repaired in recent years. As it stands, however, the recent hearing showed that the doors remain in an unacceptable state of disrepair in A-Pod. *See* Tr. vol. 8. at 1500 (Gary Chamblee of Benchmark Construction confirming that the cell doors in A-Pod still do not work: "the cell door[s] [are] not operational so they're really not doing anything right now, so . . . .").

### E.      The Lights Do Not Work

Over a year ago, the monitors reported that "[i]nmates live in darkness much of the time because most of the lights do not work." Docket No. 83 at 3 [hereinafter Thirteenth Monitoring Report]. The County, however, reported shortly after the February 2021 visit that "it has invested a substantial amount of time and money in repairing the detention facilities to comply with the Consent Decree" and had "repaired the lighting in Pod A where the detainees were living in the dark for protracted periods of time." *Id.* At 4.

Yet in the February 2022 Evidentiary Hearing, it was confirmed that there are still few working lights. *See* Tr. vol. 8 at 1532. The detainees spend most of their time in the dark, both in their cells and in the dayroom. Officers must use flashlights to complete well-being checks. *See* Tr. vol. 10 at 1856.

As Mr. Parrish testified, it's important to see what's going on in the cell. "There could be contraband. There could be fights. Somebody could be injured, could be ill, could be overdosing. So, yes, you need to see what's -- in the well-being checks, you need to be able to see the individual." Tr. vol. 8 at 1407. Sheriff

13

Tyree Jones agrees that the combination of cell doors that do not lock and lack of lighting presents serious safety and security issues. *See* Tr. vol. 11 at 1957.

### F.      A-Pod Is at Risk of Burning Down

Indifference to fire safety remains a life-threatening concern in A-Pod. The Monitoring Team reports that there is no fire alarm system in RDC and no sprinkler system in the inmate housing areas. *See* Thirteenth Monitoring Report at 3. In A-Pod there are neither fire hoses nor extinguishers. Tr. vol. 8. at 1516; Tr. vol. 1. at 96; *see also Gates v. Collier*, 501 F.2d, 1291, 1300 (5th Cir. 1974) ("there is a lack of adequate fire fighting equipment making it, as stated by the Penitentiary Superintendent, 'almost impossible to put out a fire at Parchman.'").

This problem is exacerbated by the number of fires at RDC. The potential ramifications are obvious and devastating.

### G.      Trash Dumpster Cells

Well over a year ago, the Monitoring Team reported that a handful of cells had become trash receptacles. *See* Thirteenth Monitoring Report at 3; *see also* Docket No. 94 at 4, 30 [hereinafter Fourteenth Monitoring Report]. These "trash dumpster cells" were damaged cells in A-Pod that the County chose to weld shut rather than repair. Inmates, meanwhile, were able to deposit trash through the cells' broken windows. As a result, the cells served "as a breeding ground for vermin." Fourteenth Monitoring Report at 4.

Since this issue was brought to the attention of RDC, the number of trash dumpster cells increased to 30. *Id.* Reportedly, some of the cells have recently been emptied and cleaned, while the majority remain welded shut, awaiting repairs. *Id.*

14

At the February 2022 Evidentiary Hearing Mr. Parrish explained that at his January 2022 site visit he counted no less than seven trash dumpster cells in just one of the four housing units in A-Pod. *See* Tr. vol. 1. at 173. Mr. Parrish approximates that there are likely still about 30 trash dumpster cells today. *Id.*

On cross-examination, Mr. Parrish added that he was told that the County has since taken additional measures to avoid the same problem from happening again. Tr. vol. 1. at 261-62. Given the County's long history of making promises and then failing to abide them, it is difficult to credit this testimony until an independent Monitor corroborates it.

The trash dumpster cell saga illustrates the level of dysfunction at RDC. As Mr. Parrish put it,

> I mean, from an operational point of view, they're short of space, so now we have 30 cells that are shut down and can't be used. That's the equivalent of a whole housing unit. That's 60 beds. And that hurts classification's ability to separate people and put them in the proper places. And from a sanitation point of view and an operational point of view, it's totally counterproductive to a well-run jail. You don't just weld doors shut and seal them up because things are broken. You fix them. And that's an ongoing problem that has yet to be resolved.

Tr. vol. 1 at 174; *see also* Fifteenth Monitoring Report at 32 (Stating that at least until September 2021, due to a lack of dedicated areas for quarantine in A-Pod, "inmates were assigned to sleep on the floor in A-Pod. They had no assigned

15

cell so no access to a toilet. Without an officer present inmates had to ask the inmates in the assigned cells to use the toilet and sometimes were required to pay for the use.").

### H.    Disrepair and Unlivable Conditions

The February 2022 Evidentiary Hearing demonstrated that the problems in A-Pod are numerous and severe with no end in sight.

For example, detainees have reported that most of the showers in A-Pod do not work, Tr. vol. 1 at 96, and this has been a "consistent problem," Tr. vol. 8 at 1408-09. "[T]he HVAC system doesn't work." Tr. vol. 6. at 1123. And there are plumbing and electrical issues. *Id.*

To this day, despite being repeatedly urged by this Court, the County has failed to provide detainees with chairs to sit in or tables on which to eat. Tr. vol. 8. at 1408.

When the Court addressed this issue in 2019, the County assured the Court that it had indeed provided detainees with tables and chairs. The then-County Attorney reiterated the Court's concern then: "But you asked me two questions in September which were very serious. One . . . why on earth anyone would have to eat sitting on the floor?" Docket No. 55 at 97. The then-County Attorney represented the following:

> I can verify as an officer of the Court, my personal inspection Thursday before last, that what you witnessed in August is no longer occurring. There's appropriate modular furniture, both chairs and tables that was bought[.]

*Id.* at 96.

16

And yet, the February 2022 Evidentiary Hearing revealed that there are still no table and chairs. As a result, detainees must eat on the floor or in their dark cells—the same cells with leaky or clogged toilets. Tr. vol. 8 at 1408. Unfortunately, the County's word has been and still is seriously called into question on many fronts, and this is but one emblematic showing.

The disrepair of A-Pod goes beyond furnishings and maintenance; it is also structural. Detainees can access the roof, and there have been "breaches." Tr. vol. 8. at 1516. As Mr. Parrish testified, detainees routinely escape, breaking out through the roof, only to return with contraband. *See* Tr. vol. 2 at 129.

One recent breach in A-Pod is illustrative. On December 27, 2021, an officer "observed two detainees on the roof." PX-88, at 469-70. "One detainee was helping the other detainee get back on the top of the roof from the side of the building." *Id.* Within moments, the detainees disappeared from the camera's view. *Id.* The detainees still in the unit placed mats high up along the periphery to obstruct officers' view. *Id.* The officers tried to enter "but the detainees would not let [them] into the unit." *Id.* One detainee was seen dropping a white bag from the ceiling. *Id.*

When officers were finally able to enter, they saw a "piece of board that seem[ed] to look out of place" on the ceiling above the stairwell. *Id.* An officer tapped the board and it fell, revealing a hole in the ceiling. *Id.* A shakedown later that day uncovered tobacco, cigarettes, cellphone chargers, and homemade shanks. *Id* at 414.

17

RDC has a long history of escapes and not all escapees return.[1] It is an understatement that the deteriorating roof presents "[m]ajor security issues." Tr. vol. 11 at 2117.

None of this will likely change soon as renovations only occur occasionally, "when the weather is good," in short intervals, and are essentially stalled while A-Pod continues to house detainees. *See* Tr. vol. 8 at 1500, 1507, 1522-23.

This impasse was evidenced by Gary Chamblee from Benchmark Construction's response to the Court's question:

> Q. So if A-Pod is to be rendered safe, what type of door work has to be completed there?
>
> A. Well, first of all, they need to determine if they're going to use A-Pod as [continued housing].

*See* Tr. vol. 8 at 1500.

## IV.   Conclusion

For these reasons, there is clear and convincing evidence that Hinds County and its Board of Supervisors have failed to comply with the Consent Decree and Stipulated Order as they pertain to A-Pod. Accordingly, the County is hereby found to be in civil contempt of court.

Imposition of "an appropriate sanction for that contempt" is again reserved pending the PLRA termination motion. *See Petroleos Mexicanos*, 826 F.2d at 398 (collecting cases).

---

[1] *See* Tr. vol. 1 at 321 (Mr. Parrish reporting that "there was an escape from the work release center several months ago. One inmate was recaptured. The other one[] is still on the lam.").

18

**SO ORDERED**, this the 23rd day of March, 2022.

s/ CARLTON W. REEVES
*United States District Judge*

19